Good afternoon. Welcome to the special sitting of the Ninth Circuit. And we welcome, of course, Judge Bright from the Eighth Circuit. We're delighted to have him sitting with us again. And, Counsel, you have your time per side, and you know the rules, and we'll look forward to hearing your argument. Good afternoon, Your Honors. Judge Rogovich v. Sandoval. Thank you, Your Honor. With me at counsel table are Adam Wolfe and Ricardo Garcia. Your Honors, may it please the Court. Pursuant to Title II of the ADA, the Board of Prison Hearings must, in the case of inmates with disabilities of past drug addiction, conduct individualized assessments that meet two criteria. First, the Board must determine whether any finding of future dangerousness is a consequence of an inmate's disability. And if so, too, the Board must determine whether or not reasonable accommodations, as, for example, mandated participation in a drug rehabilitation program, will avoid discrimination on the basis of disability without altering the nature of the parole process. Now, in this case, as before us, the allegation was that there was a blanket policy. Correct. That was one of the allegations. That was one of the two claims, Judge Fischer, and the case could be resolved on that matter, and I'm pleased to address that. But there is a... So, I'm having a little difficulty in where this case is going. Assume that we go beyond the blanket policy. Is it your contention that every parole decision involving someone who has a drug addiction is now subject to review under the ADA, so that the parole board decision has to be evaluated as to whether, in each case, there is a reasonable accommodation that we weigh and try to second-guess what the parole board does in deciding whether a convicted murder can be put out on the streets with or without a drug addiction history? That would not be our position, Your Honor. With respect to Mr. Bogovich and Mr. Thompson, both of those individuals asserted a disability under the ADA past drug addiction. For example... I'm sorry, Your Honor. The two plaintiffs in this case, Mr. Thompson and Mr. Bogovich, both asserted a disability based on past drug addiction. That is not controverted in the record. The direct answer to your question, Judge Fischer, is certainly in any instance where an individual asserts that disability, then it is incumbent upon the board to make a determination whether or not that disability, in fact, exists based on the evidence that the individuals present, and whether or not any finding of future dangerousness relates to that particular disability. Your Honor has asked a different question, as I understand it, that relates, for example, to the individuals whom they presented evidence about. I'm not asking him. I'm trying to know where this case goes. The case... Hold on a second. Sorry. I think you have been answering my question. When we had this case before, as we made clear, we were dealing with, as it was presented to us, the question of whether it was a blanket policy is that nobody with a history of drug addiction gets consideration by the parole board. Now it's come back to us with the record that says, well, wait a minute. We've got these eight cases where we've done so, and so you're starting out, well, there needs to be an individualized assessment. I'm just sort of looking down the road as to what happens if, in fact, we were to hold that the ADA not only goes beyond whether or not there's a blanket policy, but that for every parole decision in which there is drug addiction as part of the inmate's package, a murder, that it's just like checking employers. If an employer, if there's a prima facie case under McDonnell Douglas and he goes back and forth with this burden-shifting kind of approach we apply in the ADA context, where is this case going? I want to see if I can answer that question directly. What I'm saying is that on the facts of this particular case, where the two individuals, Bogovich and Thompson, did assert that disability, where it is uncontroverted, one method of resolving this case, which I believe is dispositive of the case, is was the process that Your Honor is referring to, a process of determining whether or not the individual is qualified, whether or not the finding of future dangerous relates to a disability, and then where a reasonable accommodation, whether that exists without altering the fundamental nature of parole, whether or not that process has in fact taken place. If I understand Your Honor's question correctly, when does the Board of Prison Hearings have to conduct such an assessment? Certainly where an individual makes a case that he or she has a disability that, say, relates to past drug addiction, then the ADA does require a process to make sure that that individual, consistent with Your Honor's prior decision in this case, that a parole date is not denied as a function of that disability, that that does not somehow contaminate the termination. And how do we assess that? It is a simple process to determine whether or not it has taken place. The Bogovich and Thompson records could not be clearer that the Board has that exactly backwards. That is, how do we know that process takes place? Same way you look in whether or not a battered women's syndrome case takes place with respect to the termination of parole. Is there an analysis of the individual's disability and a determination as to whether or not future dangerousness, that finding, could in fact have related from the disability? In the Irons case, which we cited at page 943, it's clear that those sorts of characteristics, unstable social history, inability to make future plans, those sorts of proxies are frequently used for drug addiction. So we would take a look at the record and we would say, hey, did the Board consider whether or not those findings flowed from a disability? If the answer is yes, that doesn't answer the question, but again, it is a simple matter to determine whether or not the Board then next says, okay, are there reasonable accommodations out there like drug rehabilitation programs or some sort of testing out there that will mitigate the impact of that disability, thinking of footnote 4 in your Honor's, the Court's decision, as to future dangerousness that doesn't alter the parole process. Now, the smoking howitzers in this case, your Honor, are at pages 121 and 74 of the record. 108, 114, and 121, 74, and 79. At 121, Commissioner Lawin is asked, he's given an objection by Mr. Bogovich and he says, you know what, your policy is not considering reasonable accommodations in terms of, for example, past, for example, drug rehab programs. That's at page 101 and 74. The Board of Prison Terms does not routinely establish conditions of parole prior to parole. That's not generally the BPT's function. It is, in fact, CDC's function. And with respect to Mr. Thompson at page 74, Mr. Thompson says, on the ADA, I did request an accommodation and they get that form. Do you request an accommodation? And both these individuals checked it. I did request an accommodation and that was consideration of a drug relapse program or drug programming as a condition of parole in your consideration of risk. Can you release me with this sort of reasonable accommodation, secure that I won't be a danger in the future if, in fact, this reasonable accommodation, this drug rehab program is part of it? And Presiding Commissioner Moore responds at page 74, okay, well, that would be if, if you were to receive a date today and if you were to receive a date, that would probably be one of the things that we would consider. Now, your honors, that is exactly backwards. What that means in terms of looking at the record to make the determination is that what the board has done is they said, look, first we'll make a determination as to whether or not there is an incident of future dangerousness. Is that a risk in this situation? Then and only then will we turn to the question of whether or not a drug rehab program exists. What the ADA demands, and this is the head case, this is the McGarry case, it's the head case at page 1265, the head case at 1065, what is specifically required is that as part of the decision-making process, not after the decision, but as part of the decision-making process, there be consideration as to whether or not these programs exist. If that's not the case, then the precise problem pointed out in head exists, and that is that the decision has been made, possibly contaminated, and in the case of Irons, in the case of Thompson and Bogovich, it is in fact foregone, a foregone conclusion as a result of the disability. That is what is so remarkable about the record in those two cases. There is not a speck of discussion about these individuals' characteristics, nor in the district court decision, these individuals' characteristics, nor whether a reasonable accommodation is available. So I would say, Judge Fisher, that the sort of inquiry, because this is a process case, but it's a profoundly important process case in terms of how to deal with drug disabilities in the parole setting, but in these records, there is nothing that indicate that consideration was made of accommodations. Last point. If you look at the cases that they've submitted, it is another way to resolve this case. We don't know from those records who's got a disability. None of those individuals claim the disability within the meaning of the ADA, and we certainly don't know what the universe is, but here's what we do know. We do know that in at least four of those cases, individuals were put in these programs after the determination was made in terms of whether they were parole ready. Now I'm going to make two points. One is, we know from the overall record in this case there is no consistent practice. Cases over Mr. Thompson and Mr. Bogovich are entitled to that process being implemented. But secondly, we know that the board knows about these programs out there, and the void in this record that is the dispositive point is that none of that consideration took place in their cases. Let me ask a different subject. You want to go back and get discovery on what? I would say this, Judge Fletcher. This case can be resolved if the court agrees with my statement just on the basis of this record because Bogovich and Thompson did not get the process. This court could say, this is the process under the ADA. They didn't get it. They should get that process. That's one of the claims they made. There is another possibility in terms of dealing with this matter that would be more exhaustive. It's more along the lines of what Judge Fletcher asked, but they made a discovery request and they said, look, if we're going to talk about the policies, then we ought to be able to see what those policies are. How are they implemented? What do the records look like? All they gave us was four cases where individuals happened to get parole, not pursuant to the process working under the ADA, but we don't know what the universe of individuals are. We don't know how many individuals were considered, should have been eligible because they had a drug addiction disability. We have no clue to that, and that's what the discovery would be aimed at. May I make just one final point, Your Honor? That is, with the ADA, my clients, quite frankly, grossly overstated what they needed to prove. They came in here and they said, and I know it's one of their claims, nobody ever gets out. Of course, they win on that. I think there's material facts in dispute about that. But if they don't do the process 10 percent of the time, 20 percent of the time, even if they don't do it 5 percent of the time, the ADA doesn't tolerate best out of 7, best out of 10 sort of record. That process has to be followed every time, otherwise the mandate of the ADA is violated. Now, I cut Your Honor off. I apologize. Looking at the persons who they indicate were released, it's very heavy with women. Is there discrimination in favor of women going on in this policy? Well, my clients were pretty clever at coming up with lots of different arguments. That one they didn't think of. But I do think that Your Honor is on to something in that it does appear to me that there is a recognition, and it's specifically part of the code, dealing with battered women syndrome. And it seems to me that Your Honor's observation may be a spill over that. And again, if we had to go back to discovery, then that would be one of the things that we'd want to know. It's hard to believe that the universe of individuals who have past drug addiction is not a huge, very male-oriented universe in order to really ascertain what the nature of the disparate treatment is. We win under reasonable accommodations. We win under disparate treatment. Thank you, Your Honor. I would like to rebut. Yeah, you have it. You don't forfeit it. Good afternoon. May it please the Court, I'm Steve Acquisto on behalf of defendants. I'd like to address three points. First, the motivating factor standard. Pull up your microphone a little bit and speak right into it loudly. Okay. I'm sorry. First, I'll address the motivating factor standard. Second, the issue about whether defendants were similarly situated to plaintiffs or, I'm sorry, not defendants, but the paroled inmates. And third, the reasonable accommodation issue. With regard to the motivating factor standard that was articulated in Head, a couple of points. First, Head was an employment case and the holding which adopts that specifically limits the application of the motivating factor standard to employment cases. It's not clear based on Head whether it has any application beyond that setting. Second, and I think more importantly, it's important to keep in mind plaintiff's claim here. Plaintiffs are not contesting any individual decision denying their own parole. They're alleging a systemic policy by defendants of categorically denying parole to all inmates with substance abuse. Well, they do. Their claim initially did, as the district court recognized, also talk about absence of individualized consideration. So is there any record of individualized consideration of these two inmates? Well, yes. Yes, there is. However, there's not a complete record with regard to any individual parole decisions pertaining to Mr. Bogovich or Mr. Thompson. I believe on remand from the Thompson opinion, this court clearly stated plaintiff's claim is whether defendants categorically exclude inmates with substance abuse histories from parole consideration. And that's what defendant's motion for summary judgment was premised on to address that claim, and that's what the court's order addressed. Is there any request, though, for the information with respect to these two prisoners as to what went on, what the records show with respect to their own parole hearings? Well, there is. They've attached incomplete portions of some of their... They are incomplete. So was there an effort under discovery to attempt to show at least to offset your universe of eight that they could show that in their own cases there was no consideration, individualized consideration given to their circumstances and how their addiction, prior addiction, might be resolved in any kind of post-release monitoring or whatever to address the issue of danger to the community? Well, I don't think the record's clear on that point. I would presume that they would have access to their own parole consideration transcripts. Well, counsel, the way this proceeded apparently was a protective order, and then you moved to the court for summary judgment and said, oh, the discovery time is over. So they really didn't get an opportunity to discover anything. Is that a mischaracterization of what happened? No, that's accurate, but I think the court needs to keep in mind what the claim, as it was defined, the claim did not pertain to their individual parole hearings. It was specifically described as alleging a policy. Yes, but they didn't get an opportunity to fully discover in respect to that policy. You said, oh, we've got some people that we let out, but they were mostly women. They were mostly abused women, and very different factors, I think, applied to them, and they should have had an opportunity to discover the number of people with drug addictions who were denied. Well, I disagree, Your Honor. The evidence before the court, and I think the key evidence was that four similarly situated inmates were released on parole by defendants. Well, you claim that they were similarly situated, but just a quick look makes me think maybe they weren't. Shouldn't there have been some discovery in respect to that? No, I think the evidence before the district court established that of those four inmates, two were male, two were female, so there wasn't a predominance for females. They all had drug addictions. They all were second-degree murderers. They all were under the influence of drugs or alcohol at the time of their murder, and they all had rehabilitated in prison, and they all had future plans to continue those efforts if they were released. All of that information was before the court, and if you're talking about discovery in the context of a Rule 56-F motion, it's important to keep in mind what discovery did they want. I know here, Counsel, the names are Roseanne, Cheryl, Maria, Celia, Stephanie, Julie, probably a man, but might not be, Richard Kemp, Gail could be a man or a woman. Gail is a man. Certainly, it's many more women than men, as you describe it here. The evidence before the district court presented the parole transcripts of, I believe, all eight inmates who were released under the Davis administration. Four of those inmates, life inmates, had substance abuse histories and prior drug addictions. Those are the four that, I think, are key to this policy and the existence or non-existence of the policy. The other four, the only relevance they might have is that those inmates, although they did not have a substance abuse history, did participate as part of the rehabilitation and programs like AA and NA. I think some of those inmates were women, but of the second degree murders with substance abuse histories, two were men and two were female. Kemp was a man and Sawbell is male. Allen and Parker were female. Now, for Rule 56F motion, for it to be granted, the key is that discovery has to be identified that is relevant to the issue. What plaintiffs wanted was government records and statistics and things of that nature, none of which would have controverted the fact that four life characteristics as plaintiffs were released. If that's the case, there can be no policy that... Well, how do we know? What if the universe was 10,000 in the pool? I'm exaggerating, but four out of 10,000, would that lead to an inference of a policy not to do it where they might accept a minuscule number, let's say it's 1,000 in the pool. 1,000 who were drug addict disabled, four out of that group similarly situated, got parole. If you look over to the other side of the universe, those who aren't drug addicted disabled, there are 1,000 of them and 500 of those folks get parole. What inference can be drawn from that kind of statistical showing? Well, the court's aware that those aren't the types of statistics we're dealing with,  It's hypothetical. principle basis, some sort of reason for the exception, if this theory of a policy is going to stand in the wake of what appear to be exceptions. But here there is no principled basis. There's no way to distinguish these life inmates who were paroled. They have all of the same defining characteristics as Mr. Bogovich and Mr. Thompson. And I don't think an allegation of a policy can stand where you have people that have clearly not been subject to that policy and you can't explain why. So regardless of whether it's... How would they be able to explain why? They didn't have discovery. Well, I don't think you need to have discovery to be able to look. The only information they needed was contained in the parole transcripts. Well, that just says that four out of a hypothetical thousand got it. No, that information gives all of the relevant characteristics. But it says four out of my hypothetical thousand, could be two thousand, got parole. And for all we know, it's because the parole board felt good that day. And we can take some judicial notice of the fact that Governor Davis was not a fan of parole for people convicted of murder. Well, I think that even four out of a thousand or whatever astronomical number the court might want to hypothesize, unless there is some way to distinguish those four from the eight. So it's 50%. There are two things that I wonder about. First of all, the issue is, is there a policy? And is it your position that by showing four similar situated secondary murderers, it establishes that that's not so? And then it was up to the plaintiffs to come back with other evidence to show that this was unique or it's not representative of the policy or something else? Well, it's our position that in the face of the evidence that shows that four inmates who were convicted, there is no evidence to refute that. Well, they didn't have a chance to get any evidence in. And then the other thing I wanted to ask you is, are we concerned in any way with why these two inmates didn't get a parole in the sense of whether those reasons given for denial were protectional when in fact it was their drug addiction that was essential and less crucial? Well, Your Honor, to answer that question, as this court recognized in Thompson, drug addiction is a relevant circumstance to consider in parole consideration because it affects, it's relevant to whether someone is dangerous or will be dangerous in the future. So the board doesn't need proxies to consider drug addiction. It can openly and directly consider that as this court has recognized. They have a legitimate penological interest in doing so. And if you look at the record, and this argument was made prior to the Thompson opinion, there are other reasons for the denial of Mr. Bogovich and Mr. Thompson's parole. And those are evident in the portions of the record from their own transcripts that they've attached. And I've pointed that out. However, given the policy or their allegation of the policy, I think, you know, again, once the evidence is that four inmates or whatever number have been released that fit that description, then that policy cannot stand. The evidence that they sought in the Rule 56 motion would not have been capable of addressing this. And as the court has recognized in the Jones case, in the Maljack case, Burlingame, the district court does not abuse its discretion in denying a Rule 56-F motion where the sought discovery would be futile. And this – You're still having trouble because I don't think you've answered my question. I'm sorry. We don't know that four is a significant number. Four may be similarly situated, but that doesn't prove, as established conclusively, that there's no policy. There may be aberrations in the policy. But if there is, as a general rule, evidence by the fact that only four out of some number, which none of it – we can only speculate here – ever, in a period of time, have ever gotten parole, that does not seem to me conclusively established that there's no unwritten policy. Well – Let's turn to another subject now. Opposing counsel says that under the ADA, each one who raises the issue that they are disabled because they're addicted are entitled to an evaluation and an accommodation. And how do you respond to that? Well, I'm glad you brought that up. The evidence presented with regard to the inmates who were paroled, as well as the evidence from Mr. Bogovich and Mr. Thompson's parole hearings, shows that the Board does consider that information. For each of the inmates released, they all presented evidence and testimony about their future plans. And the Board considered that and heard that in rendering its decision. Did they say that this accommodation can't work for these particular individuals? That's not what they said. They didn't evaluate it as one would evaluate an ADA case. Well, the accommodation the plaintiffs want is simply that the Board consider the inmates' future participation in drug rehab programs when deciding whether to grant parole. The record is clear that in all of these inmates' hearings that that was considered. And if this should be treated as a normal ADA case, I don't think it should. For the reasons recognized in footnote four in the Thompson case, for the reasons articulated by this Court in the Gates case, in the prison setting, in the parole setting, I think there are legitimate societal and penological reasons that justify a slightly different application of the ADA. I would like to address something in the record that Mr. Rosenbaum talked about. He cited to page 74, indicating that in Mr. Thompson's parole hearing, that the Board would not consider Mr. Thompson's future participation when considering to grant parole. But if you look at pages 78 and 79, just a few pages down from where counsel cited, they clear up any confusion and the commissioners make clear that they would consider Mr. Thompson's participation in parole, in rehabilitation programs, when they are considering whether to grant parole. And that's exactly the accommodation that they're asking for, and that's exactly what Mr. Thompson, as well as the other inmates, received. Finally, I'd just like to... You can wrap up. I will wrap up. My last point, Your Honor, to address your primary concern is that regardless of any other discovery, their claim is that there's this policy. We presented evidence that eight inmates were released during the tenure of Governor Gray Davis. Four of those fit the exact description that plaintiffs described themselves as. In light of that evidence, 50% of the inmates released had substance abuse addictions. The claim that there's this policy of categorically excluding such inmates from parole cannot stand. Perhaps there's a stringent standard, but there is not a standard by which inmates with substance abuse histories are excluded from parole consideration. If it had been just one, would your argument be the same? My argument would be the same, unless there is some principled way to distinguish that one inmate who was released. I don't believe a policy can stand where you can't explain it. And you don't need statistics and outside information. You should be able to look at the information pertaining to the paroled inmate to be able to say, ah, here's why this person was different than me. And that evidence was presented. That evidence was before the court. And on that basis, summary judgment for defendants should be affirmed. Okay. Thank you. Thank you. You can have five minutes since counsel for the other side got to run over a little bit. Thank you. Good afternoon, Your Honors. Adam Wolf with the ACLU Drug Law Reform Project, representing the two plaintiffs, Mr. Thompson and Mr. Bogovich. I'd like to make four points. We're going to make him speak up and speak into the microphone. Okay, that's my first point. I'm going to speak up. The first point, this case is all about numbers in two different ways. First, as Judge Fischer said, the evidence, you know, the defendants point to four instances. We don't know, is that four out of eight? Is it four out of 80? What kind of discovery did you ask for in your 56-F motion? It's in the record. They asked for parole statistics. They asked for guidance, the guidance that's been promulgated by the board. They've asked for parole manuals and transcripts of parole proceedings, I believe. That would have helped us out. Is this four out of eight, four out of 80,000? We just don't know. The second way. You have no independent information as to how many inmates are incarcerated in the system who might have drug addiction problems who fit within the similarly situated circumstances of your two clients? I'm certainly... Convicted murders. Not all inmates in California have to be convicted of murder. Right. I'm certainly not aware of that information. I'm not saying it doesn't exist. The second way this case is about numbers is that it doesn't matter whether these reasonable accommodations were denied to across the board as a policy or just as to these two plaintiffs. Can I just... I'm a little confused now. You say when this went back on remand from us, were they represented by counsel at that point? In the district court, they were not represented by counsel. So all of their discovery requests and everything, they had to do themselves, pro se? They've done an extraordinary job of litigating this case in the district court themselves, coming up with this theory and writing these briefs. But the second point about why numbers matter is that it doesn't matter whether it's 80,000 people are denied reasonable accommodations or not. The fact is, and the record is clear on this, that these two individuals were denied reasonable accommodations. And as Mr. Rosenthal said before, that should mean case over. The second point, HEDD was not explicitly limited to employment cases. In fact, HEDD was quite clear that it applies to all titles of the ADA. The most that could be said perhaps is that some of the language in HEDD is dicta. I learned the hard way that one doesn't try to write opinions in one case in the anticipation of covering all the bases. They may not have intended it or whatever, but they didn't have this case in front of them. They didn't have much weight on what they were doing. That very well may be. But in the HEDD opinion, it noted the fact that there are seven sister circuits that have ruled as it did. One of those was a Title II case, and that's the Baird case, which is a Fourth Circuit case. Another was the McNelly case. The McNelly case was an Eleventh Circuit case. And what the McNelly court did was say, you know what, this is a Title I case, but the causation standards in Titles I and II are materially identical, so we're going to look at the legislative history of Title II. And in Title II, Congress said it was being clear that it was taking out, not including the solely by reason of discrimination standard, expressly not adopting the language of the Rehabilitation Act. So if they in fact take into account, in part, the prisoner's disability, that that's a violation of the ADA? If it's a motivating factor, that's exactly right. If it's a motivating factor, even though in our remand we said it could be. Well, I'm going to jump ahead. I'll get to my fourth point, and hopefully this answers. The reasonable accommodations we request are not at all in tension with what I believe you're referring to footnote 4 in Thompson's opinion. And I'm going to read that. I'm going to read the relevant portion. Well, I know what it is. I just like to know I have a common sense answer. If the parole board can take into account the disability as part of its assessment of danger to the community, how can a mixed motive analysis be relevant? Well, because the accommodations that we request are not saying that you can't take into account future dangerousness, to borrow the language of the regulation itself. In fact, what we're saying is, of course you should take into account future dangerousness. It's just that you should consider participation in a drug treatment program at the time that you're considering the suitability. Right? Because that's the real world situation. If the parole board's modus operandi is to, when they put somebody on parole, they routinely consider how they're going to make sure that they don't reoffend by requiring enrollment in a drug program. What's the significant difference? Well, the significant difference is whether they have to put that up front and say, okay, we know we're going to do this. Therefore, now we're going to evaluate your drug addiction as an indicator of future danger. That's right. It's just a question on whether you're going to do this on the front end or the back end. It's saying, if we're going to attach this as a condition of parole, which they do, it seems like, in many circumstances, whether that should be a consideration, that real world, that practical difference, whether that should be a consideration. It's clear that they didn't do that. Because in both of the plaintiff's cases, they've denied that entirely. Denied. Denied. They've denied considering participation in a drug treatment program concurrently with a parole suitability assessment. And that's at, well, for instance, pages 108 and 121 of the Plaintiff's Excerpts of Record. They're as clear as could be with that. In fact, at one point, I think the exact language is they say that's not our policy. Right? So there's language that the defendants have pointed to. The defendants have pointed to Plaintiff's Excerpts of Record, page 79. And I think it's worth looking at that for a moment. Let's be quick. I think we're getting bogged down a little bit here. I'm sorry. But go ahead. We're going to run out of time. Okay. I'm going to take every last minute here. I'm sorry about that. In page 79, it says, and I mentioned earlier, that it's always a consideration upon our assessment of parole readiness. Upon our assessment could very well mean after they've considered parole suitability. And when they say, as I said earlier, what they're pointing to is page 74. And it says, okay, well, that would be if you were to receive a date today. That is, they're going to consider this only after they find somebody parole suitable. So there are basically two questions. What process is required and was that process followed? Okay. Thank you very much. All right. Thank you. Your Honor, can I have 15 seconds? If you can do it in 15 seconds, you'll set a new record for a lawyer on appeal. Here's my point, Your Honor. You want to ask the question, does it make a difference as to whether it happens before or after? The answer is, that's the ballgame. If the board waits until after the determination of parole readiness has been made, then the decision … That assumes they don't factor that in at all, that they don't keep in mind when they're making the assessment that one of the conditions of parole is going to be. Then the disability can disqualify an individual from that date, even though a reasonable accommodation might have solved the problem. That is, assume an individual has a serious past addiction problem, but a program would help. If you wait until the end, the determination might be you don't get parole because that's a serious predictor of future dangerousness. I think we have the point. Okay. Thank you. Counsel, thank you. It's an interesting and difficult case. The case just argued is submitted.
judges: Bright , B. Fletcher, Fisher